# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION AT COLUMBUS

ROBERT LYTLE, JR.,

                Petitioner,        :    Case No. 2:17-cv-1146

      - vs -                            Chief Judge Edmund A. Sargus, Jr.
                                    Magistrate Judge Michael R. Merz

TIM BUCHANAN,[1] Warden,
  Noble Correctional Institution
                              :
              Respondent.

# REPORT AND RECOMMENDATIONS

        This habeas corpus action under 28 U.S.C. § 2254 was brought by Petitioner Robert Lytle with the assistance of counsel and challenges his convictions for robbery in the Franklin County Court of Common Pleas. The case is ripe for decision on the Petition (ECF No. 1), the State Court Record (ECF No. 4), the Return of Writ (ECF No. 5), and Petitioner's Reply (ECF No. 10). The Magistrate Judge reference was transferred to the undersigned to assist in balancing the Magistrate Judge workload in the District.

## Procedural History

        Respondent quotes the background facts of the case and some of the procedural history from the direct appeal decision of the Ohio Tenth District Court of Appeals:

---

[1] The caption is amended to reflect that Tim Buchanan is the Warden at Noble Correctional Institution and properly named as Respondent in this case.

## I. FACTS AND PROCEDURAL HISTORY

[*P2]   Several bar robberies on the south side of Columbus committed within a two-day span in January 2014 gave rise to appellant's criminal indictment in two cases. In the first case, related to the Old Landmark Bar, appellant was indicted on January 23, 2014 for four counts of robbery pursuant to R.C. 2911.02. Under Count 1, the indictment alleged appellant, "in attempting or committing a theft offense *in respect to Old Landmark Bar*, or in fleeing immediately after the attempt or offense, did recklessly inflict, attempt to inflict, or threaten to inflict physical harm on another, to wit: Susan Puckett" on or about January 16, 2014. (Emphasis added.) (Old Landmark Bar Case Indictment at 1.) Count 2 alleged the same conduct, except "in respect to Susan Puckett." (Old Landmark Bar Case Indictment at 1.) Counts 3 and 4, alleging robbery involving the use or threatened immediate use of force against another, were nolled at the request of plaintiff-appellee, State of Ohio.

[*P3]   In the second case, related to TK Sports Bar, appellant was indicted on April 1, 2014 for four counts of kidnapping, pursuant to R.C. 2905.01, and two counts of robbery, pursuant to R.C. 2911.02. In pertinent part, Count 5 of the indictment alleged appellant, "in attempting or committing a theft offense in respect to TK Sports Bar, or in fleeing immediately after the attempt or offense, did recklessly inflict, attempt to inflict, or threaten to inflict physical harm on another, to wit: Sarah Carter" on or about January 14, 2014. (TK Sports Bar Case Indictment at 2-3.) The remaining counts were nolled at the request of appellee.

[*P4]   Appellant pled not guilty to the charges, and the cause came to trial on July 20, 2015. At the outset of the trial, the judge overruled appellant's previously filed motion to suppress photo identifications in the TK Sports Bar case due to appellant's allegation of procedure violations under R.C. 2933.83. The judge likewise overruled appellant's motion to sever trial of the separate cases and emphasized he would specifically instruct the jury regarding considering each case separately.

[*P5]   The trial commenced, and after opening statements, the judge addressed the separate nature of the cases with the jury stating:

> [A]s a matter of law * * * these are separate incidents. You are to consider and analyze each separately. Sometimes we have cases tried apart, but other times we allow them to be

together. But we always worry that a jury will say, "Well, he was involved in one, he must be involved in the other." You've got to analyze each on their own facts. They're allowed to make arguments about whether they're similar, but I did caution you that you have to decide each case separately.

(Tr. at 46-47.)

[*P6]  The trial resumed, and appellee produced the following relevant evidence in its case-in-chief.

[*P7]  Stephanie Christman testified that around 10:30 p.m. on Thursday, January 16, 2014, she was at the Old Landmark Bar watching a basketball game with her husband, Steve. According to Stephanie, a man entered the bar through the back door dressed in a grey sweatshirt with the hood up and grey sweatpants and asked the bartender for the location of the restroom. A friend of the Christmans named Bobby Gray was already in the restroom arguing on the phone with his girlfriend, and Stephanie asked her husband to check on him. When her husband returned, the man came out of the restroom wearing a ski mask and holding a gun. Stephanie dropped to the ground behind the bar, while her husband remained seated. Stephanie heard the man say to Susan Puckett, the bartender, "[g]ive me all of the money, or I'm going to kill you, bitch," then ask Puckett for her car keys and what color her car was. (Tr. at 52.) She heard scuffling, and when she got up, she saw three men restraining the man with the ski mask on the ground. Puckett kicked the gun and called 911.

[*P8]  Stephanie testified that she saw the man's face after police arrived and removed the ski mask. She identified appellant in the courtroom as the man who entered the restroom, exited the restroom 000.0in a ski mask, and was arrested by police that evening. Stephanie recalled that the lighting in the back of the bar was "a little dim" but testified that she did not have problems seeing the man or the gun, which had a laser light. (Tr. at 53.) Stephanie later learned from police that the gun was a fake. Stephanie agreed she had consumed alcohol that evening, specifically Bud Light, and did not remember how many she consumed but said she did not feel inebriated and noted she had to work the next day. On cross-examination, Stephanie agreed she could have had up to eight Bud Lights over the course of the three hours she was at the bar watching the game. Stephanie additionally agreed that in the written statement she made to police after the incident, she did not indicate that the man wore a ski mask or that he took Puckett's car keys.

[*P9]   Stephanie's husband, Steve Christman, testified that he watched a basketball game at the Old Landmark Bar on the evening of January 16, 2014 with his wife, Gray, a person named Doug Purcell, a few other people, and bartender Susie Puckett. At his wife's prompting, Steve checked on Bobby in the bathroom, and observed someone else at the urinal with his hood up. He returned and reported everything was okay, but then saw the man come out of the bathroom with a ski mask on and point the laser of a gun at Puckett's chest while she was at the cash register. According to Steve, who said he remained sitting at his bar chair, Puckett gave the man with the ski mask the money from the cash register after the man threatened to kill her. Steve then heard the man in the mask ask Puckett for her car keys and saw Puckett remove a key from her key ring and give him the key. Right before the man exited the back door, Purcell hit the man with a pool stick, possibly dislodging the gun, and Steve and Purcell took the man to the floor, where they held him until police arrived.

[*P10]   Although Steve indicated that the lighting in the bar was dim, he did not have trouble seeing individuals in the bar. Steve further testified that he was able to view the face of the man when police stood him up and removed his ski mask and identified appellant in the courtroom as that man. Steve agreed he had consumed alcohol that evening but testified that his alcohol consumption did not affect what he saw or heard that night.

[*P11]   On cross-examination, Steve agreed that he did not know if anyone else was in the restroom along with his friend Bobby and the man with his hood up but said the restroom only had room for two people. He also confirmed that in his written statement to police he did not write that the man in the ski mask threatened to kill Puckett.

[*P12]   Doug Purcell testified to being at the Old Landmark Bar on the evening of February 16, 2014. While he was at the bar, he saw a red dot on Puckett's back and observed a man with a gun wearing a "hoodie" and a mask. (Tr. at 125.) According to Purcell, the man said "[f]ucking bitch, give me the money" and "[g]ive me your money, or I'll kill you," and then asked for Puckett's car keys and where her car was located. (Tr. at 122.) Puckett and the man walked toward the back door of the bar, and Purcell thought that Puckett was going to go outside with him. Purcell hit the man in the back with a pool stick and threw him to the ground. Steve assisted him in getting the man to the ground, and someone got the gun and kicked it on the floor. Purcell thought the man probably was punched and kicked in the process. During the confrontation, Purcell recalled

4

hearing something like a radio or police scanner coming from the man.

[*P13] Purcell thought that he had two or three alcoholic drinks that night, which he believed did not affect his judgment. Purcell testified that he was able to view the man's face without the mask on and identified appellant in the courtroom as that man.

[*P14] On cross-examination, Purcell agreed that he had not included in his written statement to police that the man wore a ski mask, that the man said the threatening words he just testified to hearing, or that Purcell hit the man with a pool stick. When questioned about his identification of appellant as the assailant, Purcell testified that he did not get a good look at the man in the mask, reiterated that he did see his face, and thought appellant did not look exactly the same as he did on January 16, 2014. Purcell also agreed that he had spoken to the Christmans, Gray, and the bartender about the situation since the incident happened.

[*P15] Susan Puckett testified to being present and interacting with the purported robber during the incident at the Old Landmark Bar on January 16, 2014. Puckett testified that she was familiar with the Old Landmark Bar because she "work[s] there." (Tr. at 150.) Specifically, Puckett testified that her position at the bar was "bartender" in January 2014, but at the time of trial she was "a manager there." (Tr. at 150.) At the time of the incident, Puckett testified that she was working in the capacity of a bartender. While she was bartending, someone wearing a hoodie walked in the back door and asked where the bathroom was located. After about five minutes, Puckett testified that:

> I guess I turned around, and he was there with a ski mask on his face and a gun, demanding that I give him all the money in the register and telling me that he would kill me if I didn't comply. He stated to give him all of the money and not to bullshit him or he would kill me.
> I gave him all the money. He kept saying "all of it." And then he asked for my keys, asked me if I had a car, and wanted my keys. So I gave him -- I went and got my key ring and I took the keys off of -- I took my car key off my key ring and handed it to him.
> He asked me where my car was at. I started to go out of the building.

(Tr. at 152.)

[*P16]  At that point, customers tackled the man, and Puckett called 911 and slid the dislodged gun away from him with her foot. After police arrived, Puckett asked to see the man's face to see if she recognized him, which she did not. In court, Puckett identified appellant as the man who held up the bar. Eventually, all the money taken was returned, and Puckett got back her car keys.

[*P17]  On cross-examination, Puckett testified that she and the others try not to talk about the incident with each other. Regarding other disturbances at the bar, Puckett indicated that "in the four years that [she has] been there," only about two other bar fights had occurred. (Tr. at 171.) She agreed that in her written statement she did not include expletive words used by the assailant when demanding the money or that he wore a mask. She thought she told the detective about the mask and noted that the man still had the mask on when police arrived.

[*P18]  Randall Beam, an officer with the Columbus Division of Police, testified to responding to a robbery-in-progress dispatch on January 16, 2014 at the Old Landmark Bar. When he arrived, another officer had the suspect detained on the ground and was placing handcuffs on him. Beam recovered cash from the suspect and a nearby gun on the ground. Beam testified that police additionally recovered a cell phone from the suspect running what appeared to be a police scanner "app" in which the dispatch runs of the city police could be heard. (Tr. at 185.) Concerning the behavior of the bar patrons, Beam did not observe indications that they were drunk or needed to be checked for sobriety.

[*P19]  Craig Goodman, a patrol officer with the Columbus Division of Police, likewise testified to responding to a robbery dispatch on January 16, 2014 at the Old Landmark Bar. Goodman entered the bar, observed that patrons had subdued the suspected robber, and secured the suspect in handcuffs. Thereafter, Goodman spoke to the patrons regarding the incident, then took the suspect to the police car and secured property on his person. The property recovered included, among other items, a pair of gloves, a ski mask, a pocketknife, a cellphone and ear phones, a BB gun with a fake silencer, and cash. Goodman identified appellant in court as the person he placed in handcuffs that evening. On cross-examination, Goodman agreed that on the day of the incident the weather was cold with snow on the ground, that it was not uncommon for people to have things like gloves and hats during such weather, and that when he arrived it appeared that the suspect had taken "a pretty good beating," enough so for Goodman to call medics. (Tr. at 202.)

[*P20]  Todd Cress, a detective with the Columbus Division of Police robbery unit, testified to investigating a robbery at the Old Landmark Bar that allegedly occurred on January 16, 2014. As part of his investigation, Cress interviewed the bar patrons, the other two officers, and the suspect. In court, Cress identified appellant as the suspect that he interviewed.

[*P21]  During Cress's interview with appellant, after being read his rights and agreeing to speak with the detective about this incident, appellant claimed that he entered the bar, used the restroom, and then sat down and ordered a beer. According to appellant, he only had $12 in his pocket, and, in need of more money, he attempted to sell the fake gun to the bar patrons for $20. Instead, out of nowhere, one of the patrons who thought he knew appellant by the name of "Buddy" began beating him and other patrons joined. (Tr. at 221.) According to appellant, the bar patrons said "Call the cops. We'll say he robbed the bar since he's got the gun," and everyone agreed since they were all friends, and since the original patron at the source of the fight had convinced the group that appellant gave his sister gonorrhea. (Tr. at 222.) Appellant additionally explained that the ski mask was a black toboggan for the cold weather and that he had the police scanner to listen for robberies occurring in an area where he had recently been robbed. During the interview, appellant denied that police secured money from him and maintained his innocence when Cress feigned having viewed a videotape of the incident.

[*P22]  Sarah Carter testified that she worked as a bartender at the TK Sports Bar on the evening of Tuesday, January 14, 2014, two days prior to the Old Landmark Bar incident. According to Carter, that night:

> [A] gentleman walked in the door * * *. He started going towards the restroom. I stopped him about halfway to the restroom.
> I said, "We don't have public restrooms." He barely looked up at me and said, "I'm going to be getting a drink." Then he proceeded in the restroom.
> A couple minutes passed. He came back out, had a mask over his face, came to the middle of the bar and held a gun on me. It had one of those little red dots. That's what I focused on. It was right on my chest. He asked for me to give him all the money out of the register, and if I didn't, he was going to kill me.
> * * *
> I panicked. I jumped. I was scared. I've never had anyone point a gun at me. I immediately turned around, got him all

the money out of the register, handed it to him across the bar, and he proceeded out of the bar.

(Tr. at 249-50.)

Carter testified that the words used by the man were "[g]ive me the money out of the register" and then "[i]f you don't do this, I'm going to kill you." (Tr. at 251.) Carter testified that she was able to look at the man without a mask when he first came into the bar and described his clothes as really baggy, like sweatpants, and perhaps a sweatshirt or jacket. The mask worn by the man was black with the eyes cut out, and the gun he carried was black with a laser pointer.

[*P23]  After the man left, Carter pressed a silent alarm button underneath the bar and also used the phone to call police. Police were unable to apprehend the person who robbed her that evening, but she was later approached by detectives about a possible suspect. The detectives asked her to view a line up of six photographs, and Carter picked photograph four, the photograph of appellant, and indicated she was 60 percent sure that the photo selected was the person who robbed her. Regarding her percentage, Carter explained that she had very little chance to view the individual because he hardly made eye contact with her, and she did not want to pick the wrong person, but that the more she looked at the photo array she was "almost positive" that it was the person she chose. (Tr. at 267.) In the courtroom, Carter, without hesitation, identified appellant as the person who robbed her and stated that she was now "not worried at all" that appellant is the wrong person. (Tr. at 275.)

[*P24]  On cross-examination, Carter agreed that the description she gave police after the incident indicated that the suspect was in his late twenties to early thirties with light brown to blond hair. Carter additionally agreed that in the notes of her photo array selection, she indicated that her 60 percent determination was in part due to her being unable to see the remainder of his body in the photo because she thought the suspect was a heavier-set man.

[*P25]  During the conversation about the photo array, appellant's counsel asked Carter whether the second and fifth photograph appeared to be the same person. Carter replied, "[t]hey look similar * * *. They do look similar. I wouldn't tell you today they are the same person." (Tr. at 276-77.) When pressed about why she did not realize that two of the photographs were actually the same person, Carter replied, "[b]ecause I knew they were not the people that robbed me. I guess I didn't focus on that very much." (Tr. at 277.)

Carter agreed that she and the other bar patrons involved talked about the incident between the day the alleged robbery occurred and the day she viewed the photo array.

[*P26] Anjanette Meade, a bartender at TK Sports Bar, testified that around 10:30 p.m. on January 14, 2014, she and her boyfriend were sitting at the corner of the bar. According to Meade, a man entered the bar wearing big sweats and went into the restroom after telling Carter he would buy a drink. As Meade talked to her boyfriend, a red light appeared on his forehead and face. Meade turned and looked down the bar and saw a man with gloves, a mask, and a gun. Meade thought they were being robbed and restrained her boyfriend as the man later passed them to exit the bar.

[*P27] Meade testified that she was able to see the man's face without the mask as he passed her on the way to the restroom, in lighting that was probably dim. She said she had about two drinks that evening that did not affect her judgment. A few days later, on January 20, police asked Meade to see if a photo array included the suspected robber. Meade testified that she picked photo number four "[r]ight away" and was about 90 percent sure the man in that photo was the person who robbed the bar. (Tr. at 304.) In court, Meade testified that she remained confident in her choice and identified appellant as the person she believed robbed TK Sports Bar.

[*P28] On cross-examination, before being informed by appellant that photos two and five in the array were actually the same person, Meade expressed her belief that the photos were "[a]bsolutely" different people. (Tr. at 322.) Meade additionally confirmed that she and Carter had been friends for about six years.

[*P29] Misty Temple testified that on the night of the incident she was playing a game of pool at TK Sports Bar near the front entrance of the bar. According to Temple, a man walked into the bar wearing a toboggan rolled up on his face, a sweatshirt, and jeans. She heard Carter tell the man that he had to get a beer and then saw the man enter the restroom. When Temple next looked up, she saw the man pointing a black gun with a red laser in Carter's face, asking for money, and then saw him take the money and exit through the front door with the gun still in his hand.

[*P30] Temple testified to looking at the man's face when he walked into the bar proximate to the "pretty well lit" pool table area and observing him first speak to Carter. (Tr. at 344.) Police asked her to view a photo array on January 26, 2014, and Temple selected, with 90 percent certainty, photo number four as the person who robbed

the bar. She then changed her percentage to indicate she was 99 percent sure. In the courtroom, Temple testified that she remained 99 percent sure about the choice she made and identified appellant as "[n]o question" the person who robbed the bar. (Tr. at 360.)

[*P31]  On cross-examination, Temple agreed that in between the incident and January 26, she spoke with Carter and Meade, and someone contacted her to let her know a detective was looking for her to conduct the photo array identification. When prompted to look again at photos two and five of the array and asked by appellant's counsel "They're the same person, aren't they," Temple replied "[m]aybe." (Tr. at 354.) She agreed that at the time she identified the fourth photo as the robber of TK Sports Bar, she did not know photos two and five were the same person and explained "I wasn't looking for the same person" but rather "the person that I saw walking into TK's." (Tr. at 355.)

[*P32]  Gary Bowman, a robbery detective for the Columbus Division of Police, testified to responding with his partner, Kenneth Kirby, to a robbery at the TK Sports Bar on the night of January 14, 2014. Bowman and Kirby interviewed Carter, Meade, and a few other people that evening but did not apprehend a suspect. Days later, Cress contacted him regarding potential commonalities between the two incidents.

[*P33]  With information gathered from Cress on the suspect in the Old Landmark Bar case, Bowman compiled the photo array. According to Bowman, to create a photo array, an officer inputs into the computer the age, weight, height, facial hair qualities, and hairstyle of the suspect, and then the computer pulls up all the pictures that are supposed to be similar to those search parameters. The officer then chooses five pictures out of those supplied. Bowman testified that he was unware at the time he compiled the array that two of the photos selected were the same individual and said that he "didn't catch it" or review the names associated with the photos provided on a second sheet. (Tr. at 374.) Bowman confirmed that numbers two and five of the array were photographs of the same individual taken at different time periods and stated that the photos had "different faces" and "look[ed] like two different guys." (Tr. at 374.) Bowman provided the array to Kirby, who administered the photo array with the witnesses.

[*P34]  On cross-examination, Bowman agreed that Meade's boyfriend, who was sitting with her at the bar, could not give a description of the suspect. According to Bowman, four people present at the bar that night could give a description of the robbery

suspect and were subsequently shown the photo arrays. Out of those four, one person could not select a photo from the array as the suspected robber. Furthermore, Bowman agreed that there "[n]ever" should be a photo array with two of the same individuals and that, in Bowman's opinion, to do so was improper and a violation of the statute that governs photo arrays. (Tr. at 391.) Bowman disagreed in this instance that the photo array was unfair to appellant because that same person looked "so dramatically different" (Tr. at 391) in the two photographs, which were over a "big time frame" (Tr. at 393), so as to in essence be "two different faces" (Tr. at 391).

[*P35]  Kenneth Kirby, a police officer with the Columbus Division of Police robbery unit, testified to responding to a robbery at the TK Sports Bar, interviewing witnesses there, reviewing the surveillance video, and photographing the scene. According to Kirby, sometime later Bowman identified a suspect and asked Kirby to approach certain witnesses with photo arrays. Kirby did not know the name of the suspect, had not viewed a photograph of the suspect, and did not recall receiving a general email about the suspect broadcast by other detectives. Kirby testified that Carter selected appellant and stated she was 60 percent sure of her choice, Meade selected appellant right away and stated she was about 90 percent sure of her choice, and Temple selected appellant and stated she was 90 percent sure, which she then changed to 99 percent sure, of her choice.

[*P36]  On cross-examination, Kirby agreed that Temple told him during his initial interview that the suspect had a mustache and a slight goatee, that two other witnesses could not give a facial description of the suspect during the initial interviews, and that another witness shown the photo array could not pick anyone as the suspect. Kirby also confirmed that he presented the same photo array, with appellant in the fourth photograph position, to each witness on different days and that it is generally possible for witnesses to speak to each other about the arrays.

[*P37]  Both parties rested. Appellant objected to the admission of the photo array identification sheets due to the inclusion of the same person twice. The remainder of appellee's exhibits were admitted without objection, including appellant's taped interview with police, the surveillance video, witness statements, and photographs. The judge then read jury instructions, including a general credibility instruction and the statement, "[r]emember, you must analyze each incident independently from one another. Your decision, analysis and verdict on one case may not affect your analysis, decision and verdict on the other case. The law does allow you to consider modus operandi not as it relates to whether he's a bad person, for two

incidents, but that the incidents were similar." (Tr. at 504.) Later, the judge again stated, "Just to make sure there's no confusion, you know there are three counts, right? Two counts as it relates to the bars and one count as it relates to the bartender and the key. All three of those cases have to be decided separately." (Tr. at 515.)

[*P38] The jury found appellant guilty of all three counts of second-degree robbery under R.C. 2911.02. A sentencing hearing was held on July 22, 2015, after which the judge imposed three years of incarceration for each count of the Old Landmark Bar case to be served consecutively to each other for a total of six years and three years of incarceration on the TK Sports Bar case to be served consecutively to the Old Landmark Bar case for a total of nine years incarceration. Appellant filed a timely appeal to this court.

*State v. Lytle*, 2016-Ohio-3532, 2016 Ohio App. LEXIS 2368 (10th Dist. Jun. 21, 2016). Lytle was represented on appeal by new counsel and raised four assignments of error, not including ineffective assistance of trial counsel (Appellant's Brief, State Court Record ECF No. 4, PageID 60, et seq.).

After the Tenth District affirmed the convictions and sentence, Lytle appealed *pro se* to the Supreme Court of Ohio raising two propositions of law (Memorandum in Support of Jurisdiction, State Court Record ECF No. 4, PageID 179, et seq.). The Ohio Supreme Court declined jurisdiction. *State v. Lytle*, 147 Ohio St. 3d 1474 (2016).

While his direct appeal was pending, Lytle filed *pro se* a petition for post-conviction relief under Ohio Revised Code § 2953.21 raising five claims of ineffective assistance of trial counsel (Petition, State Court Record ECF No. 4, PageID 224, et seq.). The Common Pleas Court dismissed the petition and Lytle appealed, but his appeal was dismissed for failure to file a brief and the Tenth District twice denied motions for reconsideration (Entries, State Court Record ECF No. 4, PageID 288. 296, 304). Lytle did not appeal further to the Supreme Court of Ohio.

On September 19, 2016,[2] Lytle filed an Application to Reopen his direct appeal asserting ineffective assistance of his appellate counsel (Motion, State Court Record ECF No. 4, PageID 307, et seq.). The Tenth District denied the Application because the post-conviction appeals in question were pursued *pro se* and had been dismissed for failure to file a brief (Entry, State Court Record ECF No. 4, PageID 323). Lytle also did not appeal this decision to the Ohio Supreme Court. Having again obtained the assistance of counsel, he filed the instant Petition for Writ of Habeas Corpus December 27, 2017.

Despite being represented by counsel, Lytle did not file his Petition in the form required by Habeas Rule 2(d). Respondent reads the Petition as pleading seven grounds for relief (Return, ECF No. 5, PageID 957-59). Instead of disagreeing with Respondent's statement of the claims, Petitioner organizes his Reply around four claims (1) ineffective assistance of trial counsel, (2) double jeopardy, (3) unconstitutional pre-trial identification, and (4) improper joinder. The analysis in this Report will be organized around the claims made in the Reply.

# Analysis

## Ineffective Assistance of Trial Counsel

In the Petition, Lytle claims he received ineffective assistance of trial counsel when his trial attorney failed to file a notice of alibi and failed to present witnesses who would have established that alibi (Petition, ECF No. 1, PageID 3, ¶ 14). That is the only claim of ineffective

---

[2] Respondent has this date as June 7, 2016 (Return, ECF No. 5, PageID 957), but the Franklin County Clerk of Courts time stamp shows September 29, 2016. This is consistent with the date of notarization at PageID 308.

assistance of trial counsel made in the Petition. Lytle elaborates in his Reply that several plea bargains were offered which he would have accepted had he known his alibi witnesses would not be called (Reply, ECF No. 10, PageID 1025-26). Respondent asserts this claim is barred by Lytle's procedural default in presenting it to the state courts (Return, ECF No. 5, PageID 976-79).

The procedural default doctrine in habeas corpus is described by the Supreme Court as follows:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an adequate and independent state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause of the default and actual prejudice as a result of the alleged violation of federal law; or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *see also Simpson v. Jones*, 238 F.3d 399, 406 (6th Cir. 2000). That is, a petitioner may not raise on federal habeas a federal constitutional claim he could not raise in state court because of procedural default. *Wainwright v. Sykes*, 433 U.S. 72 (1977); *Engle v. Isaac*, 456 U.S. 107, 110 (1982). Absent cause and prejudice, a federal habeas petitioner who fails to comply with a state's rules of procedure waives his right to federal habeas corpus review. *Boyle v. Million*, 201 F.3d 711, 716 (6th Cir. 2000)(citation omitted); *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle*, 456 U.S. at 110; *Wainwright*, 433 U.S. at 87. *Wainwright* replaced the "deliberate bypass" standard of *Fay v. Noia*, 372 U.S. 391 (1963). *Coleman*, 501 U.S. at 724

> [A] federal court may not review federal claims that were procedurally defaulted in state court—that is, claims that the state court denied based on an adequate and independent state procedural rule. E.g., Beard v. Kindler, 558 U.S. 53, 55, 130 S.Ct. 612, 175 L.Ed.2d 417 (2009). This is an important "corollary" to the exhaustion requirement. Dretke v. Haley, 541 U.S. 386, 392, 124 S.Ct. 1847, 158 L.Ed.2d 659 (2004). "Just as in those cases in which

a state prisoner fails to exhaust state remedies, a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address" the merits of "those claims in the first instance." Coleman, 501 U.S., at 731-732, 111 S. Ct. 2546, 115 L. Ed. 2d 640. The procedural default doctrine thus advances the same comity, finality, and federalism interests advanced by the exhaustion doctrine. See McCleskey v. Zant, 499 U.S. 467, 493, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991).

*Davila v. Davis*, 137 S.Ct. 2058, 2064 (2017).

The Sixth Circuit Court of Appeals requires a four-part analysis when the State alleges a habeas claim is precluded by procedural default. *Guilmette v. Howes,* 624 F.3d 286, 290 (6th Cir. 2010)(*en banc*); *Eley v. Bagley*, 604 F.3d 958, 965 (6th Cir. 2010); *Reynolds v. Berry*, 146 F.3d 345, 347-48 (6th Cir. 1998), *citing Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); *accord Lott v. Coyle*, 261 F.3d 594, 601-02 (6th Cir. 2001); *Jacobs v. Mohr*, 265 F.3d 407, 417 (6th Cir. 2001).

> First the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule.
>              . . . .
> Second, the court must decide whether the state courts actually enforced the state procedural sanction, citing *County Court of Ulster County v. Allen*, 442 U.S. 140, 149, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979).
>
> Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim.
>
> Once the court determines that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate under [*Wainwright v.*] *Sykes*, 433 U.S. 72 (1977)]that there was "cause" for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.

*Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); accord, *Hartman v. Bagley,* 492 F.3d 347, 357 (6th Cir. 2007), *quoting Monzo v. Edwards*, 281 F.3d 568, 576 (6th Cir. 2002). A habeas petitioner

can overcome a procedural default by showing cause for the default and prejudice from the asserted error. *Atkins v. Holloway*, 792 F.3d 654, 657 (6th Cir. 2015), *citing House v. Bell*, 547 U.S. 518, 536 (2006).

The relevant state court rule here is that one who files an appeal must brief the assignments of error he wants the court of appeals to consider. Without question, Lytle failed to file a brief on appeal from denial of his post-conviction petition and the Tenth District held that failure against him. Thus, this claim of ineffective assistance of trial counsel is procedurally defaulted unless Lytle can show excusing cause and resulting prejudice or some other excuse.

Lytle adverts to the fact that he has always claimed to be innocent and that actual innocence will overcome a procedural bar (Reply, ECF No. 10, PageID 1021). In *Souter v. Jones,* 395 F.3d 577 (6th Cir. 2005), the Sixth Circuit held

> [I]f a habeas petitioner "presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims." *Schlup v. Delo,* 513 U.S. 298, 316 (1995)."Thus, the threshold inquiry is whether "new facts raise[] sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial." *Id.* at 317. To establish actual innocence, "a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id.* at 327. The Court has noted that "actual innocence means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623, 140 L.Ed.2d 828, 118 S.Ct. 1604 (1998). "To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial." *Schlup*, 513 U.S. at 324. The Court counseled however, that the actual innocence exception should "remain rare" and "only be applied in the 'extraordinary case.'" *Id.* at 321.

395 F.3d at 590. However, the Reply does not advert to any new evidence, whether of the kinds required by *Souter* or otherwise, instead asserting that "[n]ew evidence is only one way" to meet

the actual innocence requirement (ECF No. 10, PageID 1021, citing *Gomez v. Jaimet,* 350 F.3d 673 (7th Cir. 2003)). But *Gomez* upheld the procedural default found by the district court and correctly refused to apply *Massaro v. United States*, 538 U.S. 500 (2003), a § 2255 case, to proceedings under § 2254.

Lytle also seeks to avoid his procedural default by relying on *Martinez v. Ryan*, 566 U.S. 1 (2012), the Supreme Court held:

> [W]hen a State requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding, a prisoner may establish cause for a default of an ineffective-assistance claim in two circumstances. The first is where the state courts did not appoint counsel in the initial-review collateral proceeding for a claim of ineffective assistance at trial. The second is where appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland v. Washington,* 466 U. S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To overcome the default, a prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit. Cf. *Miller-El v. Cockrell*, 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (describing standards for certificates of appealability to issue).

132 S.Ct. at 1318-19. In *Trevino v. Thaler*, 569 U.S. 413 (2013), the Court extended *Martinez* to the Texas system. The Court held that even if though Texas' law did not require ineffective assistance of trial counsel claims to be raised in an initial collateral review proceeding as the Arizona law at issue in *Martinez* did, it made it virtually impossible for appellate counsel to adequately present such claims on direct appeal.

The Sixth Circuit has on multiple occasions elided the question whether *Martinez* and *Trevino* apply in Ohio. In *McGuire v. Warden*, 738 F.3d 741 (6th Cir. 2013), Judge Rogers wrote for the court:

> Thus, Ohio law suggests two different ways to look at *Trevino*. On the one hand, certain claims can for practical purposes only be

brought in an initial-review collateral attack in a post-conviction petition. And *Trevino* recognized that a "meaningful opportunity to present a claim of ineffective assistance of trial counsel" includes "the need to expand the trial court record." 133 S.Ct. at 1921. Ohio courts recognize that claims requiring evidence outside the record may only be meaningfully litigated in post-conviction proceedings and may loosen ordinary res judicata principles in such cases: "although ineffective assistance of counsel ordinarily should be raised on direct appeal, res judicata does not bar a defendant from raising this issue in a petition for postconviction relief if the claim is based on evidence outside the record[,] . . . even when the issue of ineffective assistance of counsel was raised on direct appeal." *State v. Richmond*, 2012-Ohio-2511, No. 97616, 2012 WL 2047991, at *1 (Ohio Ct. App. 2012) (citing *State v. Smith*, 17 Ohio St. 3d 98, 17 Ohio B. 219, 477 N.E.2d 1128, 1131 n.1 (Ohio 1985)). Thus, in Ohio, if ineffective assistance cases are divided into two categories, one could argue that the category requiring evidence outside the record must be brought on collateral review in order for review to be meaningful.

On the other hand, in the "ordinary" case, "ineffective assistance of counsel at mitigation, just like ineffective assistance at trial, is an issue that can be brought on direct appeal," *State v. Combs*, 100 Ohio App. 3d 90, 652 N.E.2d 205, 212 (Ohio Ct. App. 1994) (collecting cases), with a constitutionally required appellate attorney, *see Franklin v. Anderson*, 434 F.3d 412, 428 (6th Cir. 2006) (citing *Evitts v. Lucey*, 469 U.S. 387, 396, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985)); *see also State v. Davis*, 119 Ohio St. 3d 422, 2008 Ohio 4608, 894 N.E.2d 1221, 1226 (Ohio 2008); Ohio R. App. P. 26(B). Indeed, such a claim was raised on McGuire's direct appeal, and was treated thoughtfully by the Supreme Court of Ohio on discretionary review, albeit as part of an ineffective assistance of appellate counsel claim. Arguably, then, the review of trial counsel ineffectiveness claims in Ohio is more "meaningful" than in Texas, because in Ohio there is "ordinarily" the availability of direct review with constitutionally required counsel, with the back-up of collateral attack where evidence outside the record is required. All of this shows that the application of *Trevino* to Ohio ineffective-assistance claims is neither obvious nor inevitable.

738 F.3d at 751-52.  In the absence of decision from the Sixth Circuit, this Court should be reluctant

to extend *Martinez* and *Trevino* to Ohio.

Even if *Martinez* and *Trevino* were applicable in Ohio, Lytle would still have to show that

his ineffective assistance of trial counsel claim was "substantial" to come within that exception. In post-conviction he claimed that his attorney forgot to re-subpoena witnesses, including alibi witnesses, but the State pointed out that that claim was refuted by the trial record where defense counsel explicitly stated his reasons for not calling the witnesses, to wit, his obligation as an officer of the court not to present certain kinds of testimony. In denying post-conviction relief, the trial judge accepted this argument that the trial transcript refuted Lytle's claims about his attorney's forgetfulness (Entry, State Court Record ECF No. 4, PageID 269).

In denying relief, Judge Serrott also relied on the Ohio doctrine of *res judicata* in criminal cases. *Id.* As Judge Rogers noted in *McGuire, supra*, Ohio requires ineffective assistance of trial counsel claims to be litigated on direct appeal if they can be; otherwise they are barred by *res judicata.*

Ohio's doctrine of *res judicata* in criminal cases, enunciated in *State v. Perry,* 10 Ohio St. 2d 175 (1967), is an adequate and independent state ground of decision. *Durr v. Mitchell*, 487 F.3d 423, 432 (6th Cir. 2007); *Buell v. Mitchell*, 274 F.3d 337 (6th Cir. 2001); *Coleman v. Mitchell*, 268 F.3d 417 (6th Cir. 2001); *Byrd v. Collins*, 209 F.3d 486, 521-22 (6th Cir. 2000); *Rust v. Zent,* 17 F.3d 155, 160-61 (6th Cir. 1994)(citation omitted); *Van Hook v. Anderson*, 127 F. Supp. 2d 899, 913 (S.D. Ohio 2001).

Any claim by Lytle that *res judicata* was improperly applied to his post-conviction ineffective assistance of trial counsel claim could have been raised on appeal from denial of that petition, but here Lytle committed the additional default of failing to file a brief.

In sum, Lytle's habeas corpus claim of ineffective assistance of trial counsel is barred by his procedural default in presenting it to the state courts. This claim should be dismissed.

**Double Jeopardy**

Lytle claims the Double Jeopardy Clause protects him from being twice convicted of robbery for the events that occurred at the Old Landmark Bar, once for robbery of the business and once for robbery of the person of the bartender, Susan Puckett (Reply, ECF No. 10, PageID 1026-29. Respondent defends this claim on the merits.

On his direct appeal to the Tenth District, Lytle's second assignment of error was that the trial court erred when it refused to merge these two robbery counts under Ohio Revised Code § 2941.25. The Tenth District held that these were separate crimes under the statute because there were separate victims: Lytle took money belonging to the business and then demanded at gunpoint[3] and received her car keys from Ms. Puckett.

The Tenth District analyzed at some length the proper interpretation of Ohio Revised Code § 2941.25. *State v. Lytle, supra*, ¶¶ 52-66. Lytle attempts to reduce that argument to absurdity by claiming that under the Tenth District's reading, "*every* robbery of an establishment would lead to at least two named victims in the indictment, the establishment and the individual person." (Reply, ECF No. 10, PageID 1027). Not so. Lytle first robbed the bar by demanding its money from its agent who was present, the bartender. Then he took the personal property of the bartender by demanding her car keys. Lytle likens the situation to that of a bank robbery, but the situations would be parallel only if the bank robber took the bank's money from a teller and then demanded her engagement ring as well.

Lytle complains that the Tenth District did not apply the appropriate federal Double Jeopardy test as enunciated in *Blockburger v. United States*, 284 U.S. 299, 304 (1932), and

---

[3] Lytle was presumably not charged with aggravated robbery because the gun was a fake.

*Missouri v. Hunter*, 459 U.S. 359, 366 (1983) (Reply, ECF No. 10, PageID 1026-27). This is hardly surprising since on appeal Lytle argued the Assignment of Error solely as a violation of Ohio Revised Code § 2941.25 and did not cite any federal authority, much less *Blockburger* or *Hunter* (Appellant's Brief, State Court Record 4, PageID 61-64).

Be that as it may, the Sixth Circuit has held that an Ohio appellate decision under Ohio Revised Code § 2941.25 is completely dispositive of the cognate Double Jeopardy claim. *Jackson v. Smith*, 745 F.3d 206 (6th Cir. 2014), citing *State v. Rance*, 85 Ohio St. 3d 632 (1999), *overruled on other grounds by State v. Johnson*, 128 Ohio St. 3d 153 (2010).

> What determines whether the constitutional prohibition against multiple punishments has been violated is the state legislature's intent concerning punishment. Specifically, "[w]ith respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended."

*Jackson v. Smith*, 745 F.3d 206, 211 (6th Cir. 2014), quoting *Missouri v. Hunter*, 459 U.S. 359, 366 (1983).

Where two offenses are the same for *Blockburger* purposes, multiple punishments can be imposed if the legislature clearly intended to do so. *Albernaz v. United States*, 450 U.S. 333, 344 (1981); *Missouri v. Hunter*, 459 U.S. 359, 366 (1983); *Ohio v. Johnson*, 467 U.S. 493, 499 (1984); *Garrett v. United States*, 471 U.S. 773, 779 (1985). *White v. Howes*, 586 F.3d 1025, 1035 (6th Cir. 2009)("The current jurisprudence allows for multiple punishment for the same offense provided the legislature has clearly indicated its intent to so provide, and recognizes no exception for necessarily included, or overlapping offenses.") The *Blockburger* test is a rule of statutory construction, not a constitutional test in itself. *Volpe v. Trim*, 708 F.3d 688 (6th Cir. 2013), *citing Albernaz.* "When assessing the intent of a state legislature, a federal court is bound by a state court's construction of that state's own statutes." *Volpe, citing Banner v. Davis*, 886 F.2d 777,

780 (6th Cir. 1989).

It cannot be seriously contended that the General Assembly intended to give robbers one or more freebies by letting them rob everyone present during an establishment robbery and then requiring merger of the offenses.

When a state court decides on the merits a federal constitutional claim later presented to a federal habeas court, the federal court must defer to the state court decision unless that decision is contrary to or an objectively unreasonable application of clearly established precedent of the United States Supreme Court. 28 U.S.C. § 2254(d)(1); *Harrington v. Richter*, 562 U.S. 86, 100 (2011); *Brown v. Payton,* 544 U.S. 133, 140 (2005); *Bell v. Cone*, 535 U.S. 685, 693-94 (2002); *Williams (Terry) v. Taylor,* 529 U.S. 362, 379 (2000). Under Sixth Circuit precedent, the Tenth District's decision of the Ohio Revised Code § 2941.25 claim implicitly denies any Double Jeopardy claim based on the same facts. Lytle has not shown that the Tenth District's decision on direct appeal is contrary to or an objectively unreasonable application of clearly established Supreme Court precedent.

As part of his argument about double jeopardy, Lytle claims he was convicted on the basis of a fictitious statute. He asserts, "[t]he three robbery counts for which Lytle was tried, convicted and sentenced, contained a mental state that is not included in Ohio's robbery statute. While Ohio's robbery statute does not contain the reduced mental state of "reckless," Lytle was nonetheless indicted with "reckless" as the required mental state." (Reply, ECF No. 10, PageID 1029).

As Lytle points out, the Ohio robbery statute, Ohio Revised Code § 2911.02, does not specify a required *mens rea*. However, Ohio Revised Code § 2901.21(B) requires proof of recklessness when no other mental state is prescribed. Ohio Rev. Code § 2901.21(B). Furthermore, there is no requirement that the *mens rea* element be included in an indictment charging offenses committed in violation of Ohio Rev. Code § 2911.02. "Today we . . . hold that

when an indictment fails to charge a *mens rea* element of the crime, but tracks the language of the

criminal statute describing the offense, the indictment provides the defendant with adequate notice

of the charges against him and is, therefore, not defective." *State v. Horner*, 126 Ohio St.3d 466,

473, 2010-Ohio-3830 at ¶ 6 (2010). Nevertheless, each of the four counts in Lytle's indictment

included the *mens rea* element of "recklessness." (ECF No. 4, PageID 14-15.) Thus, had any

error occurred, it would be of the harmless variety.

Even if this argument had any merit, it comes far too late in the process. Lytle never

attacked the indictment as improper anywhere in the state court process, or even in his Petition. A

habeas petition cannot be effectively amended by raising a new issue in the reply, but must follow

the process provided in 28 U.S.C. § 2242.

Lytle's Double Jeopardy claim should be dismissed with prejudice.


**Unconstitutional Pre-Trial Identification**


In his Third Ground for Relief, Lytle complains of unconstitutional pre-trial identification.

Respondent asserts this claim is procedurally defaulted by Lytle's failure to present it as a federal

constitutional claim in the state courts. (Return, ECF No. 5, PageID 973-74.)

On direct appeal this claim was presented to the Tenth District as the Fourth Assignment

of Error and decided as follows:

> [*P71] In his fourth assignment of error, appellant contends that
> "the trial court violated R.C. 2933.83(C)(3) in the TK Sports Bar
> case by failing to instruct the jury that the jury may consider
> evidence of noncompliance with mandatory photo-lineup
> procedures in determining the reliability of the witnesses' purported
> identification of [a]ppellant." (Appellant's Brief at vii.)

[*P72]  As a preliminary issue, appellant argues that even though he did not request a jury instruction, pursuant to R.C. 2933.83(C)(3), or specifically object to the lack of this jury instruction, he preserved de novo review of this issue by objecting to the submission of the photo array generally. We disagree. Generally, the time to call an error to the court's attention is "at a time when such error could have been avoided or corrected by the trial court." [*State v.*] *Quarterman*[, 140 Ohio St.3d 464, 2014-Ohio-4034] at ¶ 15 [2014], quoting *State v. Awan*, 22 Ohio St.3d 120, 122 (1986), quoting *State v. Childs*, 14 Ohio St.2d 56 (1968), paragraph three of the syllabus. Hence, the failure to object to the lack of a jury instruction under R.C. 2933.83(C)(3) constitutes a waiver of all but plain error on appeal under Crim.R. 52(B). *State v. Wells*, 8th Dist. No. 98388, 2013-Ohio-3722, ¶ 97, citing *State v. Williams*, 51 Ohio St.2d 112 (1977); *State v. Thompson*, 4th Dist. No. 12CA688, 2013-Ohio-2235, ¶ 23.

[*P73]  The record demonstrates that defense counsel did not object to the instructions the jury received in this case. Accordingly, we address this assignment of error under the plain error standard. "To prevail under the plain-error standard, a defendant must show that an error occurred, that it was obvious, and that it affected his substantial rights." *State v. Obermiller,* [147] Ohio St. 3d [175, 2016-Ohio-1594, ¶ 62, citing *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002) (stating that an error affects substantial rights under Crim.R. 52(B) only if it affects the outcome of the trial). *See also State v. Arnold*, [147] Ohio St.3d [138], 2016-Ohio-1595, ¶ 65, citing *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph two of the syllabus (holding that an error does not rise to plain error unless "but for the error, the outcome of the trial clearly would have been otherwise"). We take "[n]otice of plain error * * * with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Long* at 97.

[*P74]  R.C. 2933.83 "requires any law enforcement agency or criminal justice entity that conducts live lineups and photo lineups to adopt minimum procedures for conducting the lineups." *Thompson* at ¶ 22; R.C. 2933.83(B). For example, these minimum procedures include, unless impracticable, use of a "blind or blinded administrator" and having the administrator make a written record of the identification. *Id.* The statute "do[es] not prohibit a law enforcement agency or criminal justice entity from adopting other scientifically accepted procedures for conducting * * * photo lineups that the scientific community considers more effective." R.C. 2933.83(D). Furthermore, R.C. 2933.83(A)(8) defines a "[p]hoto lineup" as "an identification procedure in which an array of photographs, including a photograph of the suspected perpetrator of

an offense and additional photographs of other persons not suspected of the offense, is displayed to an eyewitness for the purpose of determining whether the eyewitness identifies the suspect as the perpetrator of the offense."

[*P75] The "penalt[ies]" for failing to comply with R.C. 2933.83 is a potential jury instruction under R.C. 2933.83(C)(3), and, if the procedure was "impermissibly suggestive," potential suppression of the identification. *Wells* at ¶ 84, 98. R.C. 2933.83(C)(3) states:

> When evidence of a failure to comply with any of the provisions of this section, or with any procedure for conducting lineups that has been adopted by a law enforcement agency or criminal justice agency pursuant to division (B) of this section and that conforms to any provision of divisions (B)(1) to (5) of this section, is presented at trial, the jury shall be instructed that it may consider credible evidence of noncompliance in determining the reliability of any eyewitness identification resulting from or related to the lineup.

[*P76] Appellant contends that evidence of a failure to comply with the provisions of R.C. 2933.83 was presented at trial in order to trigger a jury instruction. Specifically, appellant points to Bowman's and Kirby's testimonies as evidence that including two photographs of the same person violated the Columbus police lineup procedure. It is true that Bowman expressed his own opinion that including two photographs of the same person was a statutory violation. However, the minimum statutory requirements and definition of photo array in R.C. 2933.83 do not address whether five distinct people must be included in the array alongside the defendant. In addition, testimony reflecting the officers' belief that the duplication never should have occurred falls short of establishing a procedure against photo duplication "adopted" by the Columbus police department under R.C. 2933.83. R.C. 2933.83(C).

[*P77] In other words, whether or not a violation of R.C. 2933.83 occurred is not obvious from record evidence. As such, we cannot say any possible defect in not including a jury instruction, pursuant to R.C. 2933.83(C)(3), rises to the level of "plain" error within the meaning of Crim.R. 52(B). *Barnes* at 28. *See also Thompson* at ¶ 24 (finding, in the context of a court's failure to impose a jury instruction under R.C. 2933.83(C)(3), no plain error occurs where insufficient record evidence demonstrates noncompliance with the statute).

[*P78] We likewise cannot say that any possible error in not including the R.C. 2933.83(C)(3) jury instruction affected the outcome of the trial. The jury heard extensive testimony and cross-examination regarding the photo array identifications and the two photographs of the same person. The witnesses testified that they did not know that two photographs of the same person were placed in the photo array and that it did not affect their selections of appellant in the photo array, and all identified appellant in court as the person who robbed TK Sports Bar. Our own review of the photo array, which is in the record on appeal, shows that the two photographs at issue are significantly different and not readily identifiable as the same person.

[*P79] Furthermore, the trial court gave the jury general instructions regarding the value of identification testimony and credibility of identification witnesses, which specifically asked the jury to consider whether each identification witness had the opportunity to make a reliable observation and specified that the jury could take into account the strength of the identification and the circumstances under which the identification was made. Such a general credibility instruction allows a jury to assess the value of photo identification testimony. *Thompson* at ¶ 24 (finding no plain error occurred in trial court's failure to give a R.C. 2933.83(C)(3) instruction where jury received a general credibility instruction and heard sufficient testimony regarding the identification); *Wells* at ¶ 100 (finding no plain error in trial court's failure to give a R.C. 2933.83(C)(3) instruction where a general credibility instruction "provided guidance to the jury to consider the circumstances surrounding the identification"). Therefore, appellant's substantial rights were not affected, and for all the above reasons, we find no plain error.

[*P80] Accordingly, appellant's fourth assignment of error is overruled.

*State v. Lytle*, 2016-Ohio-3532 (some internal quotation marks omitted).

As can be readily seen, the Tenth District decided this Assignment of Error solely under the Ohio photo identification statute, Ohio Revised Code § 2933.83. It did not purport to be deciding any federal constitutional issue nor cite any federal constitutional authority. This is scarcely surprising since the Assignment was presented solely as a state law issue and no federal case law authority was cited (Appellant's Brief, State Court Record ECF No. 4, PageID 62, 63-

65).

Lytle makes no separate argument to attempt to show cause and prejudice for this lack of fair presentation on appeal. If it were ineffective assistance of appellate counsel to fail to argue this as a federal constitutional issue (which Lytle does not argue), that claim would have to first be presented to the state courts in an application to reopen under Ohio App.R. 26(B). *Edwards v. Carpenter*, 529 U.S. 446 (2000). Lytle has never filed such an application with respect to representation on direct appeal and the time during which he could have filed such an application has long since expired.

Lytle's claim of unconstitutional pretrial identification is barred by procedural default and should be dismissed with prejudice.

## Failure to Sever Trials

Lastly, Lytle claims the failure to separately try the counts relating to the Old Landmark Bar from those relating to the TK Sports bar deprived him of a fair trial in violation of the Sixth Amendment.

Respondent asserts this claim is procedurally defaulted as well. The Warden notes that Lytle made his claim for severance in the trial court exclusively under Ohio R. Evid. 404(B). On appeal, he changed theories and made his claim solely under Ohio R. Evid. 404(A). Finally, he failed to appeal this issue to the Supreme Court of Ohio.

Denial of severance was Lytle's Third Assignment of Error on direct appeal which the Tenth District decided as follows:

[*P62]  In his third assignment of error, appellant contends the trial court erred in denying his motion to sever the trial of the two cases. For the following reasons, we disagree.

[*P63]  Ohio's criminal rules permit a court to order two or more indictments to be tried together "if the offenses * * * could have been joined in a single indictment." Crim.R. 13. Crim.R. 8(A) states that two or more offenses may be charged in the same indictment if they are of "the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." *State v. Sullivan*, 10th Dist. No. 10AP-997, 2011-Ohio-6384, ¶ 21. Joinder of multiple offenses in a single trial is generally favored because it "'conserves judicial and prosecutorial time, lessens the not inconsiderable expenses of multiple trials, diminishes inconvenience to witnesses, and minimizes the possibility of incongruous results in successive trials before different juries.'" *Id.*, quoting *State v. Walters*, 10th Dist. No. 06AP-693, 2007-Ohio-5554, ¶ 21.

[*P64]  Nonetheless, an accused may move to sever counts of an indictment on the grounds that he or she will be prejudiced by the joinder of multiple offenses. *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, ¶ 49. To succeed on a motion to sever, a defendant "'must furnish the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial.'" *State v. Lott*, 51 Ohio St.3d 160, 163 (1990), quoting *State v. Torres*, 66 Ohio St.2d 340 (1981), syllabus.

[*P65]  The state can negate a defendant's claim of prejudicial joinder in two ways. *LaMar* at ¶ 50. First, if the state shows that evidence of one offense would be admissible at a separate trial of the other offense as "other acts" evidence under Evid.R. 404(B), then joinder of the offenses in the same trial cannot prejudice the defendant. *State v. Tipton*, 10th Dist. No. 04AP-1314, 2006-Ohio-2066, ¶ 27, citing *LaMar* at ¶ 50; *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, ¶ 30; *State v. Coley*, 93 Ohio St.3d 253, 259 (2001). Second, a joinder cannot result in prejudice if the evidence of the offenses joined at trial is simple and direct, so that a jury is capable of segregating the proof required for each offense. *Tipton* at ¶ 27, citing *State v. Johnson*, 88 Ohio St.3d 95 (2000); *State v. Mills*, 62 Ohio St.3d 357, 362 (1992). These two tests are disjunctive so that the satisfaction of one negates a defendant's claim of prejudice without having to consider the other test. *State v. Gravely*, 188 Ohio App.3d 825, 2010-Ohio-3379, ¶ 38 (10th Dist.), citing *State v.*

*Cameron*, 10th Dist. No. 09AP-56, 2009-Ohio-6479, ¶ 35, citing *Mills* at 362.

[*P66]  Generally, an appellate court will not reverse a trial court's decision to deny severance unless the trial court has abused its discretion. *Lott* at 163. An abuse of discretion means that a trial court's ruling was unreasonable, arbitrary, or unconscionable. *State v. Vasquez*, 10th Dist. No. 05AP-705, 2006-Ohio-4074, ¶ 6. However, here, appellant did not move the trial court to sever the indictments either at the close of appellee's case-in-chief and the close of all evidence. As such, as acknowledged by appellant in his reply brief, he has waived all but plain error review on appeal. *State v. Corker*, 10th Dist. No. 13AP-264, 2013-Ohio-5446, ¶ 12-13. "'Plain error does not exist unless the appellant establishes that the outcome of the trial clearly would have been different but for the trial court's allegedly improper [joinder].'" *Id*. at ¶ 12, quoting *State v. McGee*, 8th Dist. No. 92019, 2010-Ohio-2081, ¶ 24, citing *State v. Waddell*, 75 Ohio St.3d 163, 166 (1996).

[*P67]  Appellant concedes that the evidence is simple and direct and that no violation of Evid.R. 404(B) or Crim.R. 14 occurred. Instead, appellant argues that "[a]llowing a jury hearing the TK Sports Bar case, in which the only contested issue was identity, to hear evidence of [appellant's] guilt in the Old Landmark Bar case violated Evid.R. 403(A), because the evidence was more prejudicial than probative" and curing the prejudice was "impossible." (Appellant's Brief at 36.) Appellant made neither argument to the trial court.  It is well-settled [sic] that a party may not raise an issue on appeal that was not initially raised before the trial court. *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, ¶ 15.

[*P68]  Furthermore, we note that, even if appellant's Evid.R. 403(A) argument could be inferred from his arguments to the trial court, the argument under Evid.R. 403(A) is only relevant to challenge appellee's assertion regarding the hypothetical admissibility of the evidence. The Evid.R. 403(A) argument does not negate the "simple and direct" evidence of the offenses, which is a separate means to negate a defendant's claim of prejudice from joinder. *LaMar* at ¶ 50; *Lott* at 163. As previously stated, appellant concedes the evidence is simple and direct, and, as such, "a joinder cannot result in prejudice." *Tipton* at ¶ 27.

[*P69]  Considering all the above, we cannot say that it was an abuse of the trial court's discretion, let alone plain error, for the court to allow the indictments to remain joined throughout the trial.

*State v.* Lytle, 2016-Ohio-3532.  A straightforward reading of the opinion supports Respondent's view that Lytle forfeited this claim by changing theories between the trial and appellate courts.

The record also shows that denial of severance was not one of the claims Lytle pursued before the Ohio Supreme Court (Memorandum in Support of Jurisdiction, State Court Record ECF No. 4, PageID 180).

Lytle offers no purported cause to excuse omitting this claim before the Ohio Supreme Court.  As with the pre-trial identification claim, if he blames the change of theories between the trial court and the court of appeals on ineffective assistance of appellate counsel, that claim is also procedurally defaulted by Lytle's failure to file a 26(B) application to reopen the direct appeal.

**Conclusion**

Based on the foregoing analysis, the Magistrate Judge respectfully recommends the Petition be dismissed with prejudice.  Because reasonable jurists would not disagree with this conclusion, Petitioner should be denied a certificate of appealability and the Court should certify to the Sixth Circuit that any appeal would be objectively frivolous and therefore should not be permitted to proceed *in forma pauperis*.

July 25, 2018.

s/ *Michael R. Merz*
United States Magistrate Judge

# NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 153-55 (1985).